# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 7363 | **DATE** | 1/29/2002 |
| **CASE TITLE** | Christina Pos vs. Res Care, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. Defendants' motion for summary judgment on Count I of the Complaint (Doc. No. 32-1) is denied. Defendants' motion for summary judgment on all counts (Doc. No. 42-1) is granted in part and denied in part. Defendants' motion to re-set the deadline for the filing of the pre-trial order (Doc. 61-2) is granted, and, by agreement, Plaintiff is directed to furnish a draft of that order for Defendants' review on or before Friday, February 1, 2002. Defendants' motions to strike (Docs. No. 57-1, 58-1) are denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | JAN 3 0 2002 |
| | Docketing to mail notices. | date docketed |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |
| ETV | courtroom deputy's initials | date mailed notice |
| | | ETV |
| | | mailing deputy initials |

Document Number

72

CLERK U.S. DISTRICT COURT

02 JAN 29 PH 5: 30

Date/time received in central Clerk's Office

FILED-ED 10

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

JAN 3 0 2002

CHRISTINA POS,                          )
                                        )
            Plaintiff,                   )
                                        )
      v.                                 )      No. 98 C 7363
                                        )
RES CARE, INCORPORATED,                 )      Judge Rebecca R. Pallmeyer
and RES CARE, ILLINOIS, INC.,           )
                                        )
            Defendants.                  )

## MEMORANDUM OPINION AND ORDER

In the fall of 1996, Plaintiff Christina Pos was promoted to a supervisory position in a facility for mentally retarded adults operated by Defendant Res Care, Inc. in Danville, Illinois. She claims that the director of the facility, Richard Robertson, harassed her from the beginning of her employment, initially making repeated unwelcome advances and, when she became pregnant within a few months of the start of her employment, making demeaning comments about her pregnancy. Soon after Ms. Pos made a formal complaint about Mr. Robertson, she suffered an on-the-job injury and was temporarily disabled. By spring, Ms. Pos had lost her job.

In this lawsuit, Plaintiff alleges that she was a victim of sexual harassment, pregnancy discrimination, retaliation for her complaints of discrimination, and retaliation for the exercise of her rights under the Illinois Workers' Compensation Act. Defendants Res Care, Inc. and Res Care, Illinois now move for summary judgment on all four counts of the complaint. Defendants argue that they are entitled to judgment in their favor on Ms. Pos's sexual harassment claim under the standards announced

in the Supreme Court's *Ellerth* and *Faragher* decisions. Defendants claim, further, that they had legitimate business reasons for restructuring and eliminating Ms. Pos's position, reasons that related to the facility's license to operate and had nothing to do with Ms. Pos's pregnancy or with her complaints. Finally, Defendants argue that no evidence establishes a causal connection between the elimination of Ms. Pos's position and her exercise of rights under the Workers' Compensation Act.

The court concludes that Defendant has met its burden with respect to both of Ms. Pos's retaliation claims, but that disputes of material fact preclude summary judgment on the sexual harassment and pregnancy discrimination claims. The motion for summary judgment is therefore granted in part and denied in part.

## FACTS

Defendant Res Care, Inc., is a Kentucky corporation that operates intermediate care facilities for developmentally disabled individuals in several states, including Illinois. (Def.'s Rule 56.1 Stmt ¶ 2.) Until August 1996, Plaintiff Christina Pos worked for Res Care as a Qualified Mental Retardation Professional ("QMRP") at a facility operated by Res Care in San Antonio, Texas. As described below, this case arises from Pos's employment with Res Care's Danville Manor facility in Danville, Illinois.

Res Care had purchased the Danville Manor facility in 1995. (Def.'s Rule 56.1 Stmt. ¶ 5.) Soon after the purchase, Res Care's Vice President for Operations, Barbara Winters, and other managers, determined that the facility should be downsized and its residents moved to group homes or community integrated living arrangements ("CILAs"). (*Id.*) In April 1996, the Illinois Department of Public Health surveyed

2

Danville Manor and, in the parties' words, "pulled three of the eight conditions of participation." (*Id.* ¶ 6.) The court understands this to mean that IDPH cited Danville Manor for violations of state licensing standards in three active areas: client protection, staffing, and active treatment. (*Id.*) In June, IDPH surveyed Danville Manor again and "restored the active treatment condition" (presumably, reinstated Danville Manor's license certification in this area), but refused to restore the client protection and staffing conditions. (*Id.* ¶ 7.) By late July or August, IDPH notified Res Care that Danville Manor was in the formal process of decertification. (Pltf.'s Rule 56.1 Stmt. ¶ 7, citing Winters Dep, Ex. 19, at 71, 172-73) and would not be permitted to proceed with plans to downsize and to move residents to CILAs absent compliance with all regulatory standards. (Def.'s Rule 56.1 Stmt. ¶ 8.)

In August 1996, Res Care hired Rick Robertson as Danville Manor's Administrator and directed him to work toward the goal of moving residents to CILAs. (*Id.* ¶ 5.) In August 1996, Res Care promoted Ms. Pos from her position in San Antonio to a position as the Director of Program Services or Residential Services Director at the Danville Manor facility in Danville, Illinois, second only to Robertson in the Danville Manor hierarchy. (*Id.* ¶¶ 5, 9, 10.) In this position, Ms. Pos had primary responsibility for the active treatment of developmentally disabled residents of Danville Manor. (*Id.* ¶ 11.) Defendants assert that Ms. Pos "was charged with maintaining Danville Manor's compliance with IDPH's relating to active treatment, and ensuring that IDPH continued to approve this condition at Danville Manor" (*Id.* ¶ 12), but the evidence they

3

cite establishes only that Danville Manor had continuing difficulties with respect to the "active treatment" condition after her employment. (*See* Winters Dep., Ex. 19 to Pltf.'s 56.1, at 66-68, 70, 77-78.)[1] Ms. Pos testified that she never received a written job description until some time after the filed a grievance in January 1997 and that she was unaware that the facility was "in decertification and out of conditions" until several weeks after beginning her job with Res Care. (Pos Dep., Ex. 18 to Pltf.'s 56.1, at 97, 104, 105.)

**Harassment by Robertson**

From the beginning of her employment at Danville Manor, Ms. Pos found Mr. Robertson's behavior overly-familiar and inappropriate. In their initial telephone conversation, Ms. Pos called him "Mr. Robertson," and he replied, "Please call me Rick." (Pos Dep., Ex. 18 to Pltf.'s 56.1, at 81.) When they first met in person, Ms. Pos extended her hand to him, but he proceeded to hug her instead, saying, "We don't shake hands. We hug." (*Id.* at 84.) Within a few days of meeting Ms. Pos, Robertson told her that "[h]is wife was a bitch" and that he was "glad to be [living] away from his wife [during the week] because they needed the space." (*Id.* at 86.) Robertson

---

[1] There is no evidence that Defendants ever formally advised Ms. Pos that she was responsible for the "active treatment" condition, and Plaintiff claims nobody communicated this to her until after she filed a formal grievance against Mr. Robertson on January 23, 1997. (Pltf.'s Rule 56.1 Stmt. ¶ 12.). The court does not find all of this testimony entirely credible; Ms. Pos held a position of significant responsibility at Danville Manor, but she professed to be uncertain about her job responsibilities for several weeks and uncertain of what authority she exercised over subordinates. (Pos Dep. at 113-116.) Nevertheless, at least in part because Mr. Robertson himself did not furnish an affidavit or appear for a deposition, Ms. Pos's testimony concerning her relationship with him and her role at Danville Manor is largely unrebutted.

suggested that Plaintiff take a ride with him to see houses he might purchase in Danville and told her "that there would be a lot of time for fun" after problems at Danville Manor were addressed. (*Id.* at 88.) When Ms. Pos learned, a few weeks after beginning her employment at Danville Manor, that the facility's license was in jeopardy, she spoke to Mr. Robertson about this matter; he acknowledged the problem but did not address it, instead inviting her to lunch. (*Id.* at 108.)

Ms. Pos testified that Mr. Robertson's unwelcome behavior continued throughout the fall. For example, Mr. Robertson frequently discussed his own prior affairs in the workplace. Ms. Pos recalled that the first such discussion took place at a breakfast meeting at the Ramada Inn, two to three weeks after she began her employment at Danville Manor. (*Id.* at 139.) In this conversation, Robertson described previous relationships, the places in which the amorous activity took place, and sexual positions. He made a reference to some kind of sexual activity involving a bathtub filled with butterscotch and cherry jello cubes, asking Ms. Pos which of the two she would prefer. (*Id.* at 140.) Ms. Pos asked him about his wife's reaction to this behavior. She recalls that he responded by saying, "Christa, excuse my french, but I could be caught fuckin' a girl's brains out, and she could walk in on us and I would still deny it." (*Id.* at 141.)

Soon after the Ramada Inn meeting, Mr. Robertson invited Ms. Pos to a dinner meeting at the Red Lobster, where he made a drawing of two people engaged in sexual activity and invited her to describe other sexual positions. (*Id.* at 145-146.) When she attempted to turn their conversation to work issues, he told her "you are no fun." (*Id.*

at 147.) Robertson then described his own philosophy of treatment of his clients, which includes the exercise of imagination "to put yourself into someone else's shoes," observing that he wouldn't mind being in Ms. Pos's shoes "or any other part of your clothing." (*Id.*) He talked about a waitress that he intended to "bed down," describing her as "an easy score." (*Id.* at 148.) Mr. Robertson told Ms. Pos that "the way to hold an affair . . . and not get caught" was to attend seminars and conferences with the partner, and expressed his hope that many such conferences would be scheduled for the two of them. He also told her "if we maintain a very close friendship in this manner, that it was his intent that [she] would be able to climb up the ladder with him," and that she would one day be promoted to the position of administrator of Danville Manor, "provided that [she] followed his rules." (*Id.* at 198-99.)

In yet another conversation at a Bob Evans Restaurant, Mr. Robertson described how easy it would be to carry on an affair in Danville. (*Id.* at 149.) He picked up a sausage and showed it to Ms. Pos with an innuendo about his own greater "shape [and] size." (*Id.* at 150.) At a work-related seminar, Mr. Robertson told Ms. Pos, "I like being this close to you," and urged her to wear tighter clothing. (*Id.* at 152.) He identified the restaurant where they had lunch as a discreet location for the two of them to begin an affair. (*Id.* at 152.)

As early as September or October 1996, Ms. Pos expressed her concerns about Mr. Robertson's behavior in a telephone conversation with Joe Ward, who had been her supervisor when she worked at Res Care's San Antonio facility. (*Id.* at 123.) Mr. Ward

urged her to "do my job to the best of my ability and to just ward off all advances to maintain professional composure." (*Id.* at 124.) Mr. Ward recalls conversations with Ms. Pos from the early days of her employment at Danville; from her reports, Ward concluded that Mr. Robertson was "out of control, irresponsible," and guilty of harassment. (Ward Dep., Ex. 21 to Pltf.'s 56.1 Stmt., at 22-23.) He encouraged her to "focus on the job and get it done. . . ." (*Id.* at 20.) Ms. Pos also spoke with Sue Cahill, the Director of Nursing at Danville Manor, who gave her similar advice: "She would say maintain professional composure, do your job and be professional, . . . . She said you are new and be careful." (Pos Dep. at 125-126; 127.)

In mid-October 1996, Mr. Robertson directed Ms. Pos to meet with him in his hotel room, explaining that this privacy was necessary in order to discuss the "new plan from corporate" without other staff becoming concerned about their job security. (*Id.* at 159.) Ms. Pos sat at a chair near a table, but Mr. Robertson stretched out on his bed and urged her to "come over here and let's get comfortable." (*Id.* at 160.) Ms. Pos refused to join him on the bed. (*Id.* at 160-61.) Later that month, Mr. Robertson asked Ms. Pos to help him move his clothing from one hotel room to another and directed that she "wear a good set of fittin' jeans." (*Id.* at 162.) While they moved the clothing, Mr. Robertson referred to the occasion as an "opportunity that is knocking on the door," and told Ms. Pos to "close that door and nobody would have to know." (*Id.*) Again, Ms. Pos declined this overture and Mr. Robertson's further invitation that she join him for a drink. (*Id.* at 162-63.) A couple of days later, Mr. Robertson urged Ms. Pos to stop

wearing loose dresses and to begin wearing jeans and tighter clothing. (*Id.* at 164.)

In mid-November, Ginger Hipsher came to Danville for an interview. Robertson invited Ms. Hipsher and Ms. Pos to dinner, ordered drinks, discussed body piercing and tried to warm Ms. Pos up by rubbing his hands around her waist beneath a jacket. (*Id.* at 154-56; 158.) He then invited the two women to party at his hotel, but both declined. (*Id.* at 156.)

**Pregnancy**

In November, Ms. Pos learned she was pregnant. She conveyed this news to Mr. Robertson, at the same time expressing her confidence that her pregnancy would not affect her work performance. (*Id.* at 163.) Mr. Robertson voiced his own doubts and observed that Ms. Pos's belief that her pregnancy would not affect her performance was inconsistent with his own experience "with every woman I have ever worked with." (*Id.* at 168, 171.) Throughout the fall, Mr. Robertson had made sexual innuendoes and overtures – for example, "How many sexual positions can you think of?" "Who were you trying to impress with those new shoes [when] I wasn't with you?" (*Id.* at 165-166.) For the first time after hearing her announcement, Mr. Robertson did not invite Ms. Pos to lunch, but asked Sue Cahill to join him instead. (*Id.* at 168-69.) Ms. Pos attributes Mr. Robertson's coolness to her pregnancy. Roger Pavey, a co-worker, likewise testified that over time the professional relationship between Ms. Pos and Mr. Robertson "became quite strained," for reasons Mr. Pavey did not understand. (Pavey Dep., Ex. 21 to Pltf.'s 56.1, at 66.)

Despite her assurances, Mr. Robertson expressed his concerns about the work performance of pregnant women, making specific reference to his expectation that their feet would swell, in the presence of other workers. (*Id.* at 174-176.) In conversations with Sue Cahill, Mr. Robertson complained that women perform poorly after delivering babies, that Ms. Pos would be complaining about her fatigue and other symptoms, and that Ms. Pos would likely need a small refrigerator in her office to store breast milk. (*Id.* at 177.) Ms. Pos assured him that not all women are the same and that her own pregnancy would not be a problem. (*Id.* at 178.) On one occasion, Steve Combs entered Mr. Robertson's office while Ms. Pos was there and, in a discussion about fishing, Ms. Pos expressed her own enthusiasm for fishing. Mr. Robertson said, "What would we use you for, as the bobber?" (*Id.* at 179.) Roger Pavey testified to the same or a similar incident in which, according to Pavey, Robertson said "something along the line of, you couldn't go fishing because, by the time spring came, you would be so fat that you would be bobbing up and down like a bobber in the river." (Pavey Dep, Ex. 21 to Pltf.'s Rule 56.1 Stmt. at 58.)

Just before Christmas 1996, a meeting took place at which Danville Manor staff discussed the need for everyone to work more hours. (Pos Dep. at 189.) Following this meeting, Ms. Pos met with Mr. Robertson privately and told him her doctor had advised her to work fewer hours and handed him a note from her doctor. (*Id.* at 190.) Ms. Pos testified that her doctor imposed a restriction of 20 hours work per week, and a lifting restriction of 20 pounds. (*Id.* at 191.) Mr. Robertson crumpled the note and

threw it in the trash can, commenting, "I don't think we need to be worrying about this at this time. What you need to be thinking about is how you are going to explain to your children how you are going to lose your job if you don't work up to 60 hours a week." (*Id.* at 188. 354-55.) Mr. Robertson suggested she would need to begin working from 3:30 a.m. until 9:30 a.m., and then return to work from 2:00 p.m. until midnight. (*Id.* at 355.)

In late December or early January, Ms. Pos arrived late for work on one occasion, and Lori Clem reported that Mr. Robertson had said, "what, the bitch didn't come in because she must be nursing her pregnancy ailments." (Pos Dep. at 182, 403.) On two or three occasions in February 1997, he commented in the presence of clerical staff that he should charge Ms. Pos for her frequent use of the bathroom, a comment she understood as related to her pregnancy. (*Id.* at 185.) In March, while Ms. Pos was hospitalized, Roger Pavey recalled Mr. Robertson stating that he believed "there should be an X-ray machine placed above the door so that it could X-ray all women to see whether or not they are pregnant, but at the same time as they enter make them unable to become pregnant so as he would not have to deal with that crap." (*Id.* at 180-181; Pavey Dep. at 58, 63.)

**Ms. Pos's Complaints and Res-Care's Response**

In January 1997, Ms. Pos hoped to resolve her difficulties with Mr. Robertson informally. She wrote a letter to him on January 7 and delivered it the following day. (*Id.* at 200-01.) In this letter, Ms. Pos expressed concerns about her deteriorating

working relationship with Mr. Robertson, specifically objecting to his derogatory statements concerning her pregnancy and his references to his own expectations that her personality and work performance would suffer as a result of it. (Jan. 7, 1997 Letter, Ex. 22 to Pltf.'s 56.1 Stmt.) Mr. Robertson read the letter without emotion and thanked her for it. (*Id.* at 202.)

Ten days later, on January 17, 1997, Mr. Robertson presented Ms. Pos with a memorandum outlining his expectations regarding her work performance, and describing projects he expected she would complete or face termination from her position. (Pos Dep. at 211; Ex. 7 to Def.'s 56.1 Stmt.) With respect to each of more than a dozen projects, the memorandum set deadlines, some as early as January 24, 1997 and none later than February 3, 1997. Ms. Pos believed his summary of her performance was inaccurate and his expectations completely unrealistic. (Pos Dep. at 210-211, 216-17, 264.)[2]

On January 23, 1997, Ms. Pos prepared a written grievance, pursuant to her understanding of the procedure set forth in Res Care's Human Resources policy manual. (*Id.* at 218-19.) She personally delivered her grievance, a 13-page document, to Scott Hullinger and Barbara Winters, on January 29, during one of their periodic

---

[2]     Ms. Winters disagreed with Ms. Pos's assessment of the January task list as unrealistic, and believed that Ms. Pos failed to complete all the tasks in the time provided. (*Id.* at 208.) Other Res Care witnesses, including a social worker employed at the Danville Facility, agreed with Ms. Pos's concern that the expectations set forth in the January 16 memo were unrealistic. (Pavey Dep. at 119-120; Ward Dep. at 31, 32, 34.) Pavey explained, in addition, why a number of the items listed were valuable goals but unrelated to the concerns raised by IDPH. (Pavey Dept. at 123-124.)

visits to the Danville facility. (*Id.* at 225-227, 245.) The copy of this grievance submitted as an exhibit is apparently incomplete; but it does include an addendum in which Ms. Pos complains of harassment, discrimination, and "unequal corrective action," without specificity. (January 23, 1997 Letter, Ex. 23 to Pltf.'s 56.1.) Ms. Pos expected Hullinger and Winters to review her grievance and arrange a meeting between her and Mr. Robertson that same day (Pos Dep. at 236-47, 257); in fact, although Hullinger and Winters met with Robertson for several hours that day, they left the facility by 4:00 p.m. without another word to Ms. Pos. (*Id.* at 237.) Res Care's grievance policy called for a written response within five days; in fact, however, there was no response by February 5 (*id.* at 248), and Barbara Winters acknowledged that Res Care never made a written response to Ms. Pos's letter. (Winter Dep., Ex. 19 to Pltf's 56.1 Stmt., at 145-46, 230.)

Ms. Winters and Mr. Hullinger did interview other employees concerning the grievance, including Mr. Robertson. (*Id.* at 146.) She recalled that Mr. Robertson had acknowledged making "one or two of the remarks" that Ms. Pos found offensive, including the comment concerning using Ms. Pos "as a bobber" and buying a refrigerator to store her breast milk, comments that Ms. Winter testified she herself would not have found offensive. (*Id.* at 148, 149.) She later reported to Ms. Pos that she and Mr. Hullinger had advised Mr. Robertson not to make certain disparaging comments to her again, and he agreed. (*Id.* at 147.) Mr. Robertson did, in fact, apologize to Ms. Pos for the comment he had made concerning her pregnancy. (Pos

12

Dep. at 268.) Ms. Winters testified that she heard nothing more about the matter until Ms. Pos renewed her grievance in April. (Winters Dep. 150-51.)

Ms. Pos testified that, with difficulty, she did complete all of the tasks set forth on Mr. Robertson's January 16 memo. (*Id.* at 280, 283, 399.)[3]

**Ms. Pos's Injury and Leave**

On March 9, 1997, Ms. Pos was injured on the job when a Danville resident fell on her. (*Id.* at 287.) She suffered abdominal cramps and was taken to the hospital where she was admitted, initially for premature labor. (*Id.* at 288.) After three days, Ms. Pos was released and ordered to bed rest. (*Id.* at 289.) On March 19, 1997, while Ms. Pos was at home on bed rest, Mr. Robertson called her and advised her that Res Care had decided to restructure and eliminate her Residential Services Director position, but invited her to apply for any other position for which she was qualified. (*Id.* at 300-01, 358.) A March 24 letter, which she received several days later, confirmed that Ms. Pos's position of Residential Services Director would be eliminated effective April 1, 1997, and invited her to "apply for any current vacant position at Danville Manor for which you qualify." (*Id.* at 300-01; March 24, 1997 Letter from Robinson, Ex. 9 to Def.'s 56.1 Stmt.) Approximately ten days later, Ms. Pos contacted Res Care's corporate headquarters to inquire about filing a workers' compensation claim, and was advised by the person she spoke to that Res Care's records reflected that she had been

---

[3]    Ms. Winters testified that she believed that Ms. Pos failed to complete all the tasks in the time provided (Winters Dep. at 208), but she did not recall what action was taken as a result, (*Id.* at 154-55), and acknowledged that to her knowledge no written discipline was imposed due to Ms. Pos's alleged failures. (*Id.* at 228.)

terminated. (*Id.* at 291-3.) Soon afterwards, however, Res Care adjusted the record to place Ms. Pos on workers' compensation leave. (*Id.* at 296.)

Ms. Pos did in fact apply for the position of Director of Operations, which she believed was functionally the same position she already held, though the formal job description required an Illinois nursing home administrator's license. (*Id.* at 303, 362.)[4] In an unrelated telephone call at 4:45 p.m. on Friday, April 4, Ms. Pos learned for the first time that she had been scheduled for an interview for that position the following Monday morning. (*Id.* at 305-07.) In fact, according to Ms. Winters, Ms. Pos was not qualified for the position of operations director, and Res-Care had no interest in hiring her for that position. (Winters Dep., Ex. 19 to Pltf.'s 56.1 Stmt., at 293-94.) Ms. Winters was surprised to learn that Ms. Pos had been scheduled for an interview for the operations manager or operations director position, and was uncertain whether the purpose for that meeting was to explain to Ms. Pos that she was not qualified. (*Id.* at 136.) Later, she explained, "[T]he only thing that I can figure out is that Rick scheduled the interview to face to face tell Christa that she wasn't qualified for the position." (*Id.* at 282.) She acknowledged, however, that Mr. Robertson did not tell her that was his plan and did not otherwise explain the reasons for interviewing Ms. Pos. (*Id.*)

Whether or not Ms. Pos actually interviewed for the position on April 7 is not

---

[4]    In fact, according to Ms. Pos, in response to her grievance Mr. Robertson had provided her with a job description in which her position was assigned the title of Director of Program Services; she was unable to produce a copy of that job description, however. (Pos. Dep. at 310, 325.)

clear from the record. What is clear is that she received a letter from Mr. Robertson, dated April 7, advising her that Danville Manor had "proceeded to fill the position with a qualified candidate" and again inviting her to apply for "any currently vacant position" for which she was qualified. (Robertson April 7, 1997 letter, Ex. 26 to Pltf.'s 56.1 Stmt.)

On April 5, 1997, Ms. Pos had followed up on her January 23, 1997 grievance in a long letter to Ms. Winters. In this letter, she identified ways in which, she believed, Mr. Robertson had harassed her following the submission of her original grievance, by imposing increased working hours, reassigning her job responsibilities, and withholding necessary information. (April 5, 1997 Letter, Ex. 13 to Def.'s 56.1.) She also specifically advised Ms. Winters that "during the first 3 months [on the job], I was continually proposed [sic] by Mr. Robertson, and I declined on every occasion . . . I hoped his approaches would cease with continued rejections. His behavior continued, however, until . . . I announced that I was pregnant." (*Id.*) Ms. Winters acknowledged that in Ms. Pos's April letter, she "was alluding to some sort of inappropriate request for a relationship of some sort." (Winters Dep. at 256.)

Beginning on April 10, and continuing for several months, Ms. Pos received letters from Ms Winters seeking information relating to Ms. Winters' investigation of her grievance. Ms. Pos testified that she was unable to respond to these letters because the stress of doing so induced early labor contractions. (Pos Dep. at 329-331, 341.) By letter dated July 10, 1997, Ms. Winters advised her that she would not perform any further review of the matter. (*Id.* at 347; July 10, 1997 Letter, Ex. 15 to

Def.'s 56.1.) Ms. Pos acknowledged that she never provided information to anyone at Res Care in response to Ms. Winters' April 10, 1997 letter. (*Id.* at 349.)

Ms. Pos never returned to work at Res Care. She believes she could have returned within a few weeks after her daughter's birth early in July 1997. (*Id.* at 369.) She believes, further, that Roger Pavey and Andy Schneider, who held other professional positions at Res Care, were treated more favorably, because Robertson made allowances for both of these employees' need for flexible time off. (*Id.* at 379-81.) Ms. Pos asserts that when she needed clerical staff assistance, Robertson interfered by assigning staff to unimportant tasks such as organizing his Rolodex. (*Id.* at 386, 396-99.) He also reassigned support staff who reported to Ms. Pos and met with consultants from other Res-Care facilities without her knowledge or involvement. (*Id* at 386-89, 395.) Although she had been involved in planning the transition to CILA operations, Ms. Pos recalls, after she told Mr. Robertson of her pregnancy, he excluded her from meetings and discussions concerning these plans. (*Id.* at 400-02.)

## Res-Care's Explanation for Ms. Pos's Termination

Barbara Winters, the Vice-President of Operations for Res Care, is responsible for all of its facilities in the states of Illinois, Indiana, and Ohio. (Winters Dep., Ex. 19 to Pltf's 56.1 Stmt., at 10.) In 1996, Ms. Winters visited the Danville facility once or twice a month. (*Id.* at 22.) She testified that the decision to restructure Ms. Pos's position was made on December 13, 1996, when Res Care managers learned there would be a state licensing monitor in the facility, that there would surveyors in the

facility seven days a week, and that Res Care would need "two licensed people at that facility very quickly." (*Id.* at 58-59.) Ms. Winters was unaware that in 1996, Mr. Robertson had asked Ms. Pos to sign up to take the test to become an administrator. (*Id.* at 64.) Ms. Winters herself did not consider the possibility that Ms. Pos might obtain the necessary license because, in her words, "there were concerns relative to the timeliness and accuracy of her work at that particular point in time." (*Id.* at 61.)

Although she insisted that the decision to restructure Ms. Pos's job was made in 1996 and that changes were to be made "quickly," (*id.* at 59), Ms. Winters acknowledged that in the process of meeting with Ms. Pos and Ms. Hullinger to discuss her grievance in January 1997, she did not raise the subject of phasing out her position. (*Id.* at 152, 272.) Jackie Crilly was not hired to fill the need for a second licensed administrator until the following April or May (*id.* at 90), and Ms. Pos testified without contradiction that nobody advised Ms. Pos herself about these changes until March 1997.

Roger Pavey, a social worker actively involved in running Danville Manor in late 1996 and 1997, was unaware of any reorganization; he testified, "I guess my understanding was that her [Ms. Pos's] employment was terminated. I didn't know anything about an elimination of a position." (Pavey Dep. at 73.) Pavey understood that Jackie Crilly was hired as Resident Services Director, the same title Ms. Pos had held, and he was unaware of any functions she performed beyond those that Ms. Pos had performed. (*Id.* at 73.) Mr. Pavey found it odd that the position was not posted

prior to Ms. Crilly's being hired. (*Id.* at 74.) He acknowledged that the written job descriptions for the two positions were different (*id.* at 77), but he recalled no differences in Ms. Crilly's functions, "either formally or in fact" from those performed by Ms. Pos, and pointed out that Ms. Pos did perform many of the functions listed in the Director of Operations position description. (*Id.* at 74, 78.) When asked whether he believed Ms. Pos had been "singled out or made a scapegoat for the facility's problems," Mr. Pavey responded, "We were all working in a team environment, and she was the one who ended up losing employment. So, on some level, I would say that, in fact, she was singled out." (*Id.* at 67.)

Ms. Winters recalled that program services declined during Ms. Pos's tenure. (*Id.* at 66-67.) Ms. Winters believed that Rick Robertson and possibly Scott Hullinger articulated those concerns to Ms. Pos; Ms. Winters herself has no personal knowledge concerning such communications, however. (*Id.* at 61, 307-09.) She was uncertain precisely when she became aware of Ms. Pos's unsatisfactory performance, but recalled that it was before Ms. Pos became pregnant. (*Id.* at 62.) Ms. Winters did not see Mr. Robertson's January 16, 1997 memo to Ms. Pos prior to that date and did not discuss the issues raised in that memo prior to that date. (*Id.* at 139, 140, 143.) Asked what steps were taken to put Ms. Pos on notice of her performance deficiencies, Ms. Winters explained that "it would have been verbal conversations and then the January memorandum" but she acknowledged that she herself had no conversations with Ms. Pos about her performance, and that it "would have been Rick Robertson" who had

such conversations. (*Id.* at 62-63.) To Ms. Winters' knowledge, no written discipline was ever imposed, nor were there any written warnings concerning Ms. Pos's performance. (*Id.* at 228, 295.)

## DISCUSSION

Christina Pos claims she is a victim of sexual harassment, pregnancy discrimination, and retaliation. She also asserts a state law claim that Res Care retaliated against her for seeking workers' compensation benefits. Res Care seeks summary judgment on all four of these claims. As described above, the court finds disputes of fact concerning Ms. Pos's sexual harassment and pregnancy discrimination claims. With respect to her retaliation claims, the court concludes that Ms. Pos has not offered evidence sufficient to meet the burden of establishing that her termination was causally connected to protected activity. A brief discussion of the parties' legal arguments follows.

## I.    Title VII Theories

Plaintiff asserts three claims under Title VII: sexual harassment, pregnancy discrimination, and retaliation. The facts underpinning these claims overlap to a large extent and can be summarized briefly: Plaintiff asserts that her supervisor, Rick Robertson, made repeated direct and indirect sexual advances on her. Ms. Pos declined these advances, but Robertson pursued her until he learned late in 1996 that Ms. Pos was pregnant. At that point, Mr. Robertson abruptly lost interest; he not only ceased soliciting her for sex, but also stopped treating her as a member of the management team. According to Ms. Pos, this change made it impossible for her to perform

effectively as the facility's Residential Services Director. When she complained formally, management made little effort to investigate. Instead, once she went on medical leave in March 1997, Res Care replaced her. Although Res Care now asserts her job was eliminated as a result of a reorganization, there are disputes of fact concerning that assertion. Months passed before Res Care carried out this purportedly urgent restructuring; Ms. Pos and her co-worker, Roger Pavey, were never advised of the reorganization; and the job description for Ms. Pos's replacement was substantially identical to her own.

Most significantly, Mr. Robertson himself is the only person who had first-hand knowledge of Ms. Pos's alleged performance deficiencies. Because he did not testify or offer an affidavit, Ms. Pos's own account of his inappropriate behavior and her own effective job performance is unrebutted. Joe Ward's testimony corroborates her assertion that she was troubled by Robertson's behavior from the beginning of her tenure at Danville Manor, and Roger Pavey's testimony provides some substantiation for her insistence that her job performance was not the genuine reason for her discharge.

## A. Sexual Harassment

Res Care argues that it is entitled to summary judgment on the sexual harassment claim for two reasons, but the court finds neither of these persuasive. First, Res Care invokes the affirmative defense recognized in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). (Defendants' Memorandum in Support of their Motion for Summary Judgment on All

Counts of the Complaint (hereinafter, "Def.'s Memo"), at 6-9.) As those decisions explain, however, such a defense is not available where, as here, the alleged harasser is a supervisor whose conduct "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. at 808; *cf. Haugerud v. Amery School Dist.*, 259 F.3d 678, 696 (7th Cir. 2001) (noting the need to distinguish between the harassment allegedly perpetrated by supervisors and that allegedly perpetrated by co-workers). Ms. Pos asserts that she did suffer a tangible employment action because of Mr. Robertson's harassment of her. Res Care's position is that Ms. Pos's job was eliminated for reasons unrelated to harassment, but disputes of fact surround that position. Robertson himself was the only source of information available to Ms. Winters, for example, concerning Ms. Pos's alleged performance deficiencies. Ms. Pos has presented evidence from which a jury could conclude that Mr. Robertson imposed unrealistic expectations and conveyed criticisms of her performance because she declined his advances.

Res Care's second argument for summary judgment on Ms. Pos's sexual harassment claim is that it was not timely filed. (Defendants' Memorandum in Support of Their Motion for Summary Judgment on Count I (hereinafter, "Count I Memo"), at 4-6.) Res Care notes that Mr. Robertson ceased making advances on Ms. Pos at or near the time she announced her pregnancy in mid-November. She filed her charge of discrimination on September 22, 1997, more than 300 days later. In Res Care's view, Mr. Robertson's offensive conduct all occurred prior to the charge-filing period. The court disagrees. As the Seventh Circuit has explained, in a sexual

harassment case, "the plaintiff may not base her . . . suit on conduct that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct, as in a case in which the conduct could constitute, or be recognized, as actionable harassment only in the light of events that occurred later, within the period of the statute of limitations." *See Galloway v. General Motors Serv. Parts Corp.*, 78 F.3d 1164, 1166 (7th Cir. 1996). This principle applies well in Ms. Pos's case, where Defendant Res Care has also argued that the conduct of which she complains was not sufficiently severe or pervasive to constitute sexual harassment. (Count I Memo, at 8.) Until she lost her job, Ms. Pos might well not have suffered any actionable harm as a result of Mr. Robertson's actions. Moreover, Ms. Pos had complained to Res Care's managers about Mr. Robertson's behavior; until Res Care had an opportunity to investigate and take corrective action, the time for filing a charge does not run. *Frazier v. Delco Elec. Corp.*, 263 F.3d 663 (7th Cir. 2001). As the *Galloway* court observed, "We do not want to encourage premature or precipitate litigation." 78 F.3d at 1166. Res Care's argument, that Ms. Pos should have filed her charge in November 1996, would do precisely that.

Res Care's motion for summary judgment on Ms. Pos's sexual harassment claim is denied.

## B. Pregnancy Discrimination

Res Care argues that the evidence does not support Ms. Pos's claims of pregnancy discrimination. As reflected above, the court finds disputes of fact preclude summary judgment on this claim as well. First, Mr. Robertson expressed his belief Ms.

22

Pos's performance would suffer as a result of her pregnancy. He also made hostile comments about Ms. Pos's excessive use of the restroom due to her pregnancy, her potential need for refrigerator space for her breast milk, and her function as a "bobber" on a fishing trip. Perhaps most dismaying was Roger Pavey's recollection of Mr. Robertson's suggestion (the court hopes it was made in jest) that Res Care install x-ray equipment to detect pregnancies and avoid the difficulties that hiring pregnant women might create.

Ms. Pos testified that Robertson's attitude and demeanor toward her changed as a result of her pregnancy. Res Care argues that there is no "hint" of evidence connecting Mr. Robertson's attitude to the decision to restructure and eliminate Ms. Pos's position. (Def.'s Memo, at 11.) To the contrary: Ms. Winters testified that this decision was largely a function of Ms. Pos's poor job performance. Yet Ms. Winters visited the facility only occasionally and admittedly obtained most of her information concerning Ms. Pos's performance from Mr. Robertson himself. There is evidence from which a jury could conclude that his view of her job performance was colored by his attitude toward her pregnancy and his expectations that it would render her less capable. As the Seventh Circuit has observed, " '[s]ummary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action.' " *Eiland v. Trinity Hosp.*, 150 F.3d 747, 752 n.1 (7th Cir. 1998), quoting *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994).

Ms. Winters did testify that she became aware of Ms. Pos's performance

deficiencies before learning of her pregnancy, and Res Care insists that the decision to eliminate Ms. Pos's job was a consequence of regulatory action in December 1996.[5] Yet Res Care offers no explanation for its failure to carry out that decision or even to communicate the decision with Ms. Pos herself for several more months. In January 1997, Mr. Robertson gave her a list of tasks and advised her that she faced termination if she failed to accomplish those tasks within certain time frames. If the decision to eliminate her job had already been made, the memo was unnecessary and misleading. Under these circumstances, a jury may well conclude that the decision to restructure and eliminate Ms. Pos's position was a function of pregnancy discrimination.

Res Care's motion for summary judgment on Ms. Pos's pregnancy discrimination claim is denied.

## C. Retaliation

If the court were writing on a clean slate, it might well conclude that Ms. Pos's retaliation claim survives summary judgment, as well. Robertson responded to Ms. Pos's complaint with a long list of projects he expected her to complete immediately, warning her that failure to meet these suddenly-imposed deadlines would result in termination. Although Res Care urges that the decision to restructure and eliminate Ms. Pos's position had been made months earlier, no one implemented that decision or

---

[5]     In Res Care's view, the state's determination that Danville Manor was not in compliance with state and federal standards is a purely objective measure of Ms. Pos's inadequate performance. (Def.'s Memo, at 16.) As previously noted, however, Ms. Pos herself has testified that she was never advised that compliance with licensing standards was her sole responsibility, and Res Care has not rebutted that testimony.

even communicated it to her until after she had made complaints.

Under the controlling case law, however, the suspicious timing Ms. Pos presents is not sufficient, without more, to support a claim of retaliation. To establish a prima facie case of retaliation, Ms. Pos bears the burden of presenting evidence that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between her protected activity and Res Care's decision to restructure and eliminate her job. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000), citing *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 397 (7th Cir. 1998); and *Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1309 (7th Cir. 1997). This court agrees with Res Care that Ms. Pos has no direct evidence of retaliation, and agrees, further, that only the elimination of her job is adverse action that may be challenged as actionable retaliation. (Def.'s Memo at 19, 20.) To demonstrate a causal link between the job elimination and her protected activity, Ms. Pos must present something more than suspicious timing. Instead, she must "produce facts which somehow tie the adverse decision to [her] protected actions." *Sauzek*, 202 F.3d at 918, citing *Stagman v. Ryan*, 176 F.3d 986, 1001 (7th Cir. 1999); and *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998). The mere fact that one event preceded another is not enough. *Bermudez*, 138 F.3d at 1179.

In her January 7, 1997 letter to Mr. Robertson, Ms. Pos complained about derogatory statements he had made, referring specifically to his expectations that her performance would deteriorate as a result of her pregnancy, that she would need a

refrigerator for her breast milk, and that she could be a "bobber" on a fishing trip. (Jan. 7, 1997 Letter, Ex. 22 to Pltf.'s 56.1.) She did not explicitly mention discrimination in this letter. The court has not seen a full copy of her January 23, 1997 grievance, but at least one page of that document refers to harassment, discrimination, and "unequal corrective action," albeit without explanation or detail. (Jan. 23, 1997 Letter, Ex. 23 to Pltf.'s 56.1.) Ms. Winters initiated an investigation of that grievance. Ms. Pos was not satisfied by the outcome and was disappointed by Res Care's failure to respond in writing to her concerns. Yet she offers no evidence that Res Care managers were motivated by the grievance in their decision to restructure and eliminate her job. Indeed, her January 7, 1997 letter indicates her relationship with Mr. Robertson had sharply deteriorated well before that letter was written. Moreover, Ms. Winters continued her investigation of Ms. Pos's grievance for several weeks after Ms. Pos had been notified she was no longer employed by Res Care.

Res Care's motion for summary judgment on Ms. Pos's retaliation claim is granted.

## II.    Retaliation for Exercise of Workers' Compensation Rights

Finally, the court turns to Ms. Pos's claim under the Illinois Workers' Compensation Act. That Act prohibits an employer from retaliating against a worker for exercising rights or remedies granted by the Act. See 820 ILCS 305/4(h). Illinois has recognized an independent cause of action for retaliatory discharge for employees whose employment is terminated as a result of their exercise of rights under the statute, including the right to file a workers' compensation claim. *See Kelsay v.*

26

*Motorola, Inc.*, 74 Ill.2d 172, 384 N.E.2d 353, 357 (1978). To recover under this theory, Plaintiff must prove that she was employed prior to her injury, that she exercised her rights by filing a claim for benefits, that she was subsequently discharged, and that her discharge was causally related to her claim. *Clemons v. Mechanical Devices Co.*, 184 Ill.2d 328, 704 N.E.2d 403, 406 (1998), citing *Gonzalez v. Prestress Eng'g Corp.*, 194 Ill.App.3d 819, 823, 551 N.E.2d 793 (4th Dist. 1990). Plaintiff may proceed even if she has not filed a claim; "it is enough if she had sought medical attention for her injuries and . . . her employer discharged her for that assertion of her workers' compensation rights." *Reinneck v. Taco Bell Corp.*, 297 Ill.App.3d 211, 214, 696 N.E.2d 839, 842 (5th Dist. 1998), citing *Bray v. Stan's Rental, Inc.*, 196 Ill.App.3d 384, 387, 553 N.E.2d 791, 792-93 (3rd Dist. 1990).

The facts here do not support a conclusion that Ms. Pos's expected exercise of workers' compensation rights motivated her discharge by Res Care. After a collision with a Danville Manor resident, Ms. Pos suffered premature labor pains and was ordered home on bed rest. Her communication with Res Care personnel about a possible workers' compensation claim occurred several days after Mr. Robertson notified her by telephone of the decision to eliminate her position. The letter confirming that phone call, similarly, was dated several days prior to her contact with Res Care concerning a possible claim for benefits.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment on Count I of the Complaint (Doc. No. 32-1) is denied. Defendants' motion for summary judgment on all counts (Doc. No. 42-1) is granted in part and denied in part. Defendants' motion to re-set the deadline for the filing of the pre-trial order (Doc. 61-2) is granted, and, by agreement, Plaintiff is directed to furnish a draft of that order for Defendants' review on or before Friday, February 1, 2002. Defendants have moved to strike Plaintiff's Supplemental Rule 56.1 Statement and to strike portions of Plaintiff's response to Defendant's Rule 56.1 Statement. In preparing this decision, the court has reviewed the underlying evidentiary materials rather than relying on the parties' characterizations of those materials in the Rule 56.1 Statements. Accordingly, Defendants' motions to strike (Docs. No. 57-1, 58-1) are denied as moot.

ENTER:

Dated: January 29, 2002

REBECCA R. PALLMEYER
United States District Judge